# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TODOR KOTSEV,

        Plaintiff,

        vs.

CAROLYN W. COLVIN, *Acting Commissioner of Social Security*,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 13-1637
Judge Nora Barry Fischer

## MEMORANDUM OPINION

## I.    INTRODUCTION

Todor Kotsev ("Plaintiff") brings this action under 42 U.S.C. § 1383(c)(3) seeking review of the final determination of the Commissioner of Social Security ("Defendant") or ("Commissioner") denying his application of Supplemental Security Income ("SSI") under Title XVI of the Social Security Act 42 U.S.C. §§ 1381–1383(f) ("Act"). This matter comes before the Court on cross motions for summary judgment. (Docket Nos. 11, 15). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment [11] is denied, and Defendant's Motion for Summary Judgment [15] is granted.

## II.    PROCEDURAL HISTORY

Plaintiff applied for SSI March 18, 2011, alleging a disability onset of September 2, 2001, due to vision impairment, stroke, and left-side paralysis.[1] (R. at 104–14, 132). His claim

---

[1] Plaintiff had previously applied for Social Security benefits in March 2008, but was denied because he was not a United States citizen at the time. (R. at 142).

was initially denied on May 23, 2011, and Plaintiff filed a written request for a hearing on July 7, 2011. (R. at 42–46, 51–52). A hearing was subsequently held on September 6, 2012. (R. at 22–33). Plaintiff appeared with his wife, Alexandra Boneva, and his attorney, Steven F. Kessler. (*Id.*). Charles M. Cohen, Ph.D., an impartial vocational expert, also testified. (*Id.*). In a decision dated September 27, 2012, ALJ Leslie Perry-Dowdell considered Plaintiff's age, education, work experience, and residual functional capacity ("RFC") to determine that Plaintiff is "not disabled" under the Act. (R. at 18). Plaintiff then requested a Review of Hearing Decision before the SSA Appeals Council. (R. at 7). This request was also denied, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6).

Plaintiff subsequently filed a Complaint with this Court on November 19, 2013, (Docket No. 3), followed by a Motion for Summary Judgment and Supporting Brief on March 3, 2014. (Docket Nos. 11; 12). The Commissioner timely answered with a Cross-Motion for Summary Judgment and Brief on April 28, 2014. (Docket Nos. 8; 15; 16). Accordingly, the matter has been fully briefed and is ripe for disposition.

## III.    STATEMENT OF FACTS

### A.    General Background

Plaintiff was born on June 25, 1962 in Bulgaria, and became a United States citizen on March 11, 2011. (R. at 102). As of March 28, 2011, he lived in McKeesport, Pennsylvania with his wife and his son. (R. at 105). Plaintiff is able to read and write English. (R. at 131).

Plaintiff is a college graduate. (R. at 133). He worked in Bulgaria as a Section Manager from February 1993 through August 1998. (R. at 123, 167). In this job, Plaintiff worked full-time and spent some of his time supervising five other people. (R. at 153). The job entailed sitting for

eight hours per day, with no walking, standing, climbing, stopping, kneeling, crouching, crawling, handling, or reaching. (*Id.*). He frequently lifted one pound, and the heaviest weight he lifted was twenty pounds. (*Id.*). Plaintiff then worked as a Service Engineer from September 1993 until September 2001. (R. at 123, 167). This was also a full-time job and involved sitting for eight hours daily, with no walking, standing, climbing, stopping, kneeling, crouching, crawling, handling, or reaching. (R. at 154). Plaintiff frequently lifted one pound, which was also the heaviest weight he lifted in this job. (*Id.*).

Plaintiff stopped working on September 2, 2001 due to a ruptured aneurysm,[2] and has not worked since. (R. at 132). Plaintiff and his family are supported by his wife, who is employed by Davidson Auto Company. (R. at 107). Plaintiff also receives food stamps. (R. at 106). During the day, Plaintiff spends most of his time at home, watching television. (R. at 143–44, 147). Every day he walks to the post office to pick up the mail. (R. at 143). He estimates that this is a ten-minute walk. (R. at 27). He goes to the grocery store with his wife twice weekly. (R. at 27, 146). He regularly attends church. (R. at 147). Plaintiff testified that he tries to help with chores around the house, such as washing dishes and laundry. (R. at 145). He has never driven a car, and he gets around by walking, using public transportation, or is driven by someone else. (R. at 146).

---

[2] A ruptured brain aneurysm, or stroke, occurs when an aneurysm (or a bulge / ballooning in a blood vessel in the brain) leaks or ruptures. This cases bleeding into the brain. "Most often a ruptured brain aneurysm occurs in the space between the brain and the thin tissues covering the brain. This type of hemorrhagic stroke is called a subarachnoid hemorrhage." *Brain Aneurysm*, MAYOCLINIC, http://www.mayoclinic.org/diseases-conditions/brain-aneurysm/basics/definition/con-20028457 (last visited June 13, 2014).

## B.    Medical History

### 1.    Status-Post Ruptured Aneurysm

Plaintiff suffered a ruptured aneurysm in September 2001 while living in Bulgaria. (R. at 172–73). A translation of a medical document from Bulgaria[3] indicates that Plaintiff was subsequently disabled, and that said disability was expected to last until January 1, 2005. (R. at 172). Plaintiff subsequently saw Dr. Rumiana Dodovska in Bulgaria for examinations and was prescribed physical therapy and medications relating to his stroke[4] and paresis[5] until moving to the United States. (R. at 136). Since 2005, he has been treating with primary care physician Dr. Veena Dhar, M.D., and neurologist Dr. Benjamin R. Smolar, M.D. (R. at 135, 186–87).

Plaintiff had a CT scan[6] of his brain on November 7, 2005. (R. at 245). This test showed signs of Plaintiff's prior stroke, but indicated no areas of acute infarct, hemorrhage, or midline shift. (*Id.*). An EEG[7] was performed on February 1, 2006, which was "essentially normal." (R. at 244).

---

[3] The ALJ gave no weight to the Bulgarian medical report, (R. at 172–73), noting that the report "is a translation of documents not in record for inspection and independent translation." (R. at 16). Neither party has contested the ALJ's determination to give no weight to this record. (Docket Nos. 12; 16).

[4] "Any acute clinical event, related to impairment of cerebral circulation, that lasts longer than 24 hours." "Stroke," STEDMAN'S MEDICAL DICTIONARY (hereinafter STEDMAN'S) 1849 (28th ed. 2006).

[5] "Partial of complete paralysis." "Paresis," *id.* at 1425.

[6] "Computerized tomography (CT scan)—also called CT—combines a series of X-ray views taken from many different angles and computer processing to create cross-sectional images of the bones and soft tissues inside your body. . . . A CT scan has many uses, but is particularly well suited to quickly examine people who have internal injuries from car accidents or other types of trauma. A CT scan can be used to visualize nearly all parts of the body." *CT Scan*, MAYOCLINIC, http://www.mayoclinic.org/tests-procedures/ct-scan/basics/definition/prc-20014610 (last visited June 17, 2014).

[7] "An electroencephalogram (EEG) is a test that detects electrical activity in your brain using small, flat metal discs (electrodes) attached to your scalp. Your brain cells communicate via electrical impulses and are active all the time, even when you're asleep. This activity shows up as wavy lines on an EEG recording. An EEG is one of the main diagnostic tests for epilepsy. An EEG may also play a role in diagnosing other brain disorders." *EEG (Electroencephalogram)*, MAYOCLINIC, http://www.mayoclinic.org/tests-procedures/eeg/basics/definition/prc-20014093 (last visited June 17, 2014).

Plaintiff was seen by Dr. Gregory L. Hung, M.D., on December 19, 2008 for evaluation of weakness in his left elbow and knee. (R. at 229–30). Dr. Hung found that Plaintiff had lost range of motion in his left elbow. (R. at 229). Plaintiff could walk without aids, and his gait was non-antalgic. (*Id.*). Overall, Dr. Hung assessed that Plaintiff had left elbow contractures and weakness in his left upper and lower extremities resulting from his stroke. (*Id.*). He encouraged Plaintiff to participate in a regular exercise program, but determined that orthopedic intervention was unnecessary. (*Id.*).

The record contains physical therapy notes from August and September 2009.[8] (R. at 242–43). These notes by therapist Jason McIntyre, PT, DPT, ATC, indicate that Dr. Smolar referred Plaintiff to physical therapy to improve his strength on the left side and his activities of daily living. (*Id.*).

Dr. Smolar examined Plaintiff on October 5, 2009 for a routine follow-up. (R. at 187). Dr. Smolar noted that Plaintiff "had a nice response to physical therapy and reports that his left sided weakness is improving." (*Id.*). Plaintiff's sensation on the left side of his face was "slightly diminished," he continued to have left-sided spastic hemiparesis, and his coordination was also diminished on the left. (*Id.*). Dr. Smolar further observed that "his strength is improved and actually [his] strength is fairly symmetric in the lower extremities." (*Id.*).

Dr. Smolar next saw Plaintiff on March 29, 2010. (R. at 186). At this examination, Plaintiff had no complaints and did not believe that his treatment required adjustment. (*Id.*). Dr. Smolar assessed that Plaintiff "continues to remain fairly strong on his left side," and has benefited from physical therapy. (*Id.*). Plaintiff's sensation appeared equal bilaterally. (*Id.*). His

---

[8] Although notes from other treaters reference that Plaintiff received ongoing physical therapy into 2012, (R. at 236), the record does not contain physical therapy notes beyond September 2009.

coordination was "slightly diminished" on the left. (*Id.*). Plaintiff was able to ambulate with circumduction[9] of the left leg and flexion[10] of his left arm, but his overall strength was good. (*Id.*).

A transothoracic echocardiogram[11] was performed on September 21, 2010. (R. at 194–95). This showed that Plaintiff had normal left ventricular[12] size, low normal systolic function,[13] a non-dilated right ventricle with normal function, and mild tricuspid[14] regurgitation.[15] (*Id.*).

Dr. Dhar completed a pre-operation physical examination on March 10, 2011. (R. at 183–84). She described Plaintiff as a "well looking male." (R. at 183). She found that Plaintiff had left elbow contracture,[16] decreased coordination on the left, and some ambulatory dysfunction. (R. at 184). Otherwise, her examination of Plaintiff was unremarkable. (R. at 183–84).

Plaintiff saw Dr. Smolar for his regular follow-up appointment on April 11, 2011. (R. at 191, 238–39). Dr. Smolar noted that Plaintiff had been stable, but continued to have "some mild left-sided deficits." (R. at 191, 238). Plaintiff was exercising daily and had "only some minimal

---

[9] "Movement of a part, e.g., an extremity, in a circular direction." "Circumduction," STEDMAN'S, *supra* note 4 at 383.

[10] "The act of flexing or bending." "Flexion," *id.* at 743.

[11] A transothoracic echocardiogram is a test that creates a picture of the heart. *Echocardiogram*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003869.htm (last visited June 16, 2014).

[12] "The lower chamber on the left side of the heart that receives the arterial blood from the left atrium and drives it by the contraction of its walls into the aorta." STEDMAN'S, *supra* note 4 at 2114.

[13] "Systolic" relates to cardiac systole, which means "[c]ontraction of the heart, especially of the ventricles, by which the blood is driven through the aorta and pulmonary artery to traverse the systemic and pulmonary circulations, respectively." "Systolic," "Systole," *id.* at 1929.

[14] "[H]aving three points, prongs, or cusps, as the tricuspid valve of the heart." "Tricuspid," *id.* at 2031.

[15] "A backward flow, as of blood through an incompetent valve of the heart." "Regurgitation," *id.* at 1668.

[16] "A contracture develops when the normally stretchy (elastic) tissues are replaced by nonstretchy (inelastic) fiber-like tissue. this makes it hard to stretch the area and prevents normal movement." This condition affects range of motion and the function of the body part, and may cause pain. *Contracture Deformity*, MEDLINE PLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003185.htm (last visited June 13, 2014).

dysfunction on the left side with weakness, sensory change, and incoordination." (*Id.*). Plaintiff had experienced a severe headache around November 2010, for which he went to the emergency room and was found to have elevated blood pressure or a viral illness. (*Id.*). Dr. Smolar noted that this issue had resolved. (*Id.*). His examination was otherwise unremarkable. (R. at 191–92, 238–39). Plaintiff was continued on Aceon[17] with direction to follow-up in one year. (*Id.*).

Plaintiff saw Dr. Smolar again on May 14, 2012. (R. at 236–37). Dr. Smolar noted that Plaintiff "has been doing well since his last visit," and was maintained on Aceon and vitamins. (R. at 236). Plaintiff denied headaches, vision problems, new numbness or tingling, and new areas of weakness. (*Id.*). He continued to have "some numbness and weakness on his left side," for which he was receiving physical therapy. (*Id.*). Dr. Smolar assessed that Plaintiff's attention, concentration, memory, and fund of knowledge "are okay." (*Id.*). He had no clear facial weakness. (*Id.*). His facial sensation was reduced on the left side. (*Id.*). Examination showed "unchanged" spastic[18] left hemiparesis,[19] diminished sensation on the left arm and left leg, with reduced coordination on the left. (*Id.*). "His gait is steady without change." (*Id.*). Dr. Smolar concluded that Plaintiff was neurologically stable and ordered him to continue with his treatment, and return for a follow-up appointment in one year. (*Id.*).

---

[17] Aceon, or perindopril, is used to treat high blood pressure. *Perindopril*, MAYOCLINIC, http://www.mayoclinic.org/drugs-supplements/perindopril-oral-route/description/drg-20069270 (last visited June 17, 2014).
[18] "One type of increase in muscle tone at rest; characterized by increased resistance to passive stretch, velocity dependent and asymmetric about joints (i.e., greater in the flexor muscles at the elbow and the extensor muscles at the knee). Exaggerated deep tendon reflexes and clonus are additional manifestations." "Spasticity," STEDMAN'S, *supra* note 4 at 1796.
[19] "Weakness affecting one side of the body." "Hemiparesis," *id.* at 866.

Dr. Dhar ordered x-rays of Plaintiff's left elbow, given his limited range of motion, and this test was performed on May 22, 2012. (R. at 220). The x-ray showed evidence of ulnar[20] trochlear[21] chondrosis[22] and biceps[23] enthesopathy.[24] (*Id.*).

2.    Ocular Issues

Plaintiff received treatment from Dr. John M. Mikula, M.D. for retinal bleeding. (R. at 185). Dr. Mikula saw Plaintiff on September 20, 2010, finding that Plaintiff had 20/20 vision in his left eye, but "best corrected vision of 20/100 in the right eye at distance and 20/70 at near." (*Id.*). His examination showed that Plaintiff's reduced vision was caused, at least in part, by a cataract[25] in the right eye. (*Id.*).

Plaintiff saw a physician[26] on several occasions in 2011 through Everett & Hurite Ophthalmological Association. (R. at 207–19). In May 2011, Plaintiff underwent surgery to remove a cataract from his right eye. (R. at 219). At the time, Plaintiff had 20/20 vision in his left eye, but only 20/150 vision in his right eye. (R. at 214, 217). Plaintiff returned to Everett & Hurite for several follow-up exams in subsequent months. (R. at 207–13). He denied pain and

---

[20] The term "ulnar" refers to the ulna, which is "[t]he medical and larger of the two bones of the forearm." "Ulnar," & "ulna," *id.* at 2063.

[21] The trochlea is "[a] smooth artificial surface of a bone upon which another glides." "Trochlea," *id.* at 2035.

[22] Chondrosis refers to cartilage. "Chondro-," *id.* at 368.

[23] "A muscle with two origins or heads. Commonly used to refer to the biceps brachii." "Biceps," *id.* at 216.

[24] "A disease process occurring at the site of insertion of muscle tendons and ligaments into bones or joint capsules." "Enthesopathy," *id.* at 649.

[25] "A cataract is a clouding of the normally clear lens of your eye. For people who have cataracts, seeing through cloudy lenses is a bit like looking through a frosty or fogged-up window." *Cataracts*, MAYOCLINIC, http://www.mayoclinic.org/diseases-conditions/cataracts/basics/definition/con-20015113 (last visited June 13, 2014).

[26] The name(s) of the physician(s) whom Plaintiff saw at Everett & Hurite are unclear because the handwriting is illegible. (R. at 207–19).

showed improved visual acuity following the surgery. (*Id.*). By August 2011, Plaintiff's vision in his right eye improved to 20/40. (R. at 207).

## C.  Functional Capacity Assessments

### 1.  Dr. Dhar's Medical Source Statements

On March 25, 2008, Dr. Dhar completed a check-the-box form for the Pennsylvania Department of Public Welfare. (R. at 174). Therein, Dr. Dhar checked that Plaintiff is "permanently disabled." (*Id.*).

Dr. Dhar provided a Medical Source Statement on July 17, 2012. (R. at 232–34). On this form, Dr. Dhar noted that Plaintiff has personality changes and memory loss. (R. at 232). She indicated that Plaintiff was able to work one hour per day, could lift five to ten pounds on an occasional basis, could frequently manipulate his right hand, could occasionally manipulate his left hand, and could constantly raise his right arm over shoulder level. (*Id.*). Dr. Dhar completed a check-the-box form wherein she indicated that Plaintiff's ability to maintain attention and concentration is not significantly impaired. (R. at 233). She checked multiple boxes regarding limitations on three other impairments, indicating that Plaintiff's ability to understand, remember, and carry out both short and simple as well as detailed instructions are "not significantly impaired" and "extremely impaired." (*Id.*). Similarly, Dr. Dhar checked that Plaintiff's ability to work with others is "moderately impaired" and "markedly impaired." (*Id.*).

### 2.  Residual Functional Capacity Assessment

State agency physician Dilip Kar, M.D., completed a residual functional capacity assessment on May 3, 2011. (R. at 34–40). Based on his review of Plaintiff's medical records, Dr. Kar determined that Plaintiff was capable of: occasionally lifting and/or carrying twenty pounds; frequently lifting and/or carrying ten pounds; standing and/or walking for a total of six

hours in an eight-hour workday; sitting for a total of six hours in an eight-hour workday; and had no limits on his ability to push and/or pull. (R. at 38).

Dr. Kar summarized Plaintiff's past work as follows: In Plaintiff's job as a section manager, he would ensure that the appropriate items were shipped by UPS, he helped to box things, and he supervised others in this work. (R. at 36). The boxes weighed, at most, twenty pounds. (*Id.*). In his job as a service engineer, Plaintiff used software to determine the currency exchange rates with Germany and Bulgaria. (*Id.*). He sat at his desk for most of the day and was not required to do lifting of any kind. (*Id.*). Dr. Kar concluded that, based on his residual functional capacity, Plaintiff was able to perform past relevant work as actually performed. (R. at 39).

### D.    Administrative Hearing

An administrative hearing was convened on September 6, 2012 before ALJ Leslie Perry-Dowell. (R. at 23–32). Plaintiff testified that since his stroke, he has had four surgeries on his right eye. (R. at 26). He continues to experience problems from his stroke, including difficulties moving his left elbow and left knee, his left leg is weak, and he has poor sensitivity on his left side. (*Id.*). Plaintiff stated that he has trouble walking, but said that he walks to the post office every day. (R. at 26–27). He estimated that this is a ten-minute walk. (R. at 27). Plaintiff said that physical therapy has helped him, but that the improvements are temporary and "for a short period of time only." (*Id.*). Plaintiff further described problems with memory. (R. at 26–27). He explained that he frequently forgets things, such as leaving his cell phone at the post office and losing his bank card and keys. (R. at 27).

Plaintiff's wife also testified. Mrs. Kotsev said that she was currently working full-time, from 8:00 a.m. to 4:30 p.m. each day. (R. at 27–28). Mrs. Kotsev described that since his stroke,

Plaintiff continues to have severe problems. (R. at 28–29). She said that Plaintiff "can't walk. He can't go to the bathroom. . . . He cannot move at all." (R. at 29). She indicated that Plaintiff required physical therapy for several months before he was able to walk. (*Id.*). When the ALJ questioned her about Plaintiff walking to the post office, Mrs. Kotsev agreed that he is able to walk to the post office each day, which is "a couple of buildings or blocks" away from their home. (*Id.*). Mrs. Kotsev also testified that Plaintiff is able to walk around the house without assistance and accompanies her to the grocery store twice each week. (*Id.*). Regarding housekeeping, Mrs. Kotsev testified that Plaintiff tries to help with laundry and dishes, but he is very slow with these chores, and she does most of the housework. (R. at 30). Mrs. Kotsev further described that Plaintiff becomes confused and loses things. (*Id.*).

The ALJ then questioned the VE about Plaintiff's past work. (*Id.*). The VE stated that Plaintiff's prior work as a section manager and service engineer were sedentary and skilled. (*Id.*). The ALJ asked the VE about a hypothetical individual with the following limitations: limited to light work; able to lift twenty pounds occasionally; able to lift and carry up to ten pounds frequently; able to stand and walk for six hours in an eight-hour day; able to stand, walk, and sit for six hours in an eight-hour day; unable to climb ladders, ropes, or scaffolds; occasionally able to climb ramps and stairs; occasionally able to balance; and unable to reach overhead with his upper left extremity. (R. at 30–31). The VE testified that this person would be able to perform Plaintiff's past relevant work. (R. at 31). The VE further testified that this hypothetical person could perform jobs that are present in the national economy, including: light cleaning (of which there are a million jobs in the national economy); light inspector (120,000 jobs); and light sorter (120,000 jobs). The ALJ posed a second hypothetical individual, with the following limitations: restricted to sedentary work; able to lift up to ten pounds occasionally; able to stand and walk for

two hours and sit for six hours in an eight-hour workday; and unable to perform any overhead lifting with the left upper extremities. (R. at 31). The VE testified that this individual would be able to perform Plaintiff's past relevant work, and could also work as a sedentary guard (50,000 jobs); a sedentary inspector (100,000 jobs); or a sedentary sorter (100,000 jobs). (R. at 31–32). The ALJ then posed a third hypothetical with the same restrictions as in the second hypothetical, but with an added restriction that the person could perform only simple, routine, repetitive tasks. (R. at 32). The VE responded that the individual's capacity is the same as the person in the second hypothetical, but that the number of jobs in the national economy for inspector and sorter would be reduced by half. (*Id.*). Finally, the ALJ posed a fourth hypothetical person who was restricted to sedentary work, with no lifting or carrying with the left upper extremity. (R. at 32). The VE testified that the individual would have the same capabilities as with the third hypothetical. (R. at 33).

Plaintiff's attorney then asked the VE whether jobs would exist if the hypothetical person was unable to sustain a routine for twenty percent of the average workday. (*Id.*). The VE responded that such an individual would not be able to sustain employment. (*Id.*).

## IV.    STANDARD OF REVIEW

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); *Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir. 2004); *Brewster v. Heckler*, 786 F. 2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must

utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005); *Barnhart v. Thomas*, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g),[27] 1383(c)(3);[28] *Hagans v.*

---

[27] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business.

42 U.S.C. § 405(g).

[28] Section 1383(c)(3) provides in pertinent part:

*Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Hagans*, 694 F.3d at 292.

Substantial evidence is "more than a mere scintilla but may be less than a preponderance." *Id.* at 292 (quoting *Plummer v. Apfel*, 186 F. 3d 422, 427 (3d Cir. 1999)); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 545 (3d Cir. 2003). It means "such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Newell*, 347 F.3d at 545 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Davis v. Astrue*, 830 F. Supp.2d 31, 34 (W.D. Pa. 2011). When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Gamret v. Colvin*, 2014 WL 109089 at *1 (W.D. Pa. Jan. 10, 2014) (citing *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947)). The court will not affirm a determination by substituting what it considers a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different

---

The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

conclusion . . . so long as the agency's fact finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Albert Einstein Med. Ctr. v. Sebelius*, 566 F.3d 368, 373 (3d Cir. 2009) (quoting *Monsour Med. Ctr. v. Heckler*, 806 F. 2d 1185, 1190–91 (3d Cir. 1986)).

## V.    DISCUSSION

In her September 27, 2012 decision, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since March 18, 2011, the alleged onset date. (R. at 13). At Step Two, the ALJ determined that Plaintiff has severe impairments including residual effects of a stroke and cataract. (*Id.*). At Step Three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

After considering the entire record, the ALJ found at Step Four that Plaintiff has the residual functional capacity as follows:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b). He can sit and stand and walk for 6 hours in an 8 hour day. [Plaintiff] cannot climb ladders, ropes or scaffolds and he can only occasionally climb ramps and stairs and occasionally balance. He cannot perform overhead reaching with his left upper extremity.

(R. at 13–14). In light of this RFC, the ALJ concluded that Plaintiff had the capacity to perform his past relevant work as a section manager and service engineer. (R. at 16). Alternatively, the ALJ found that there are jobs that exist in significant numbers in the national economy that

Plaintiff can perform. (R. at 17–18). Therefore, Plaintiff was found not disabled, as defined in the Act. (R. at 18).

On appeal, Plaintiff offers two arguments in objection to the ALJ's decision. (Docket No. 12). Plaintiff argues that the ALJ: (1) erred in giving no weight to the opinion of his treating physician, Dr. Dhar; and (2) erred by not finding at Step Three that Plaintiff met the criteria for Listing 11.04(B). (*Id.*). Defendant argues that the ALJ's decision should be upheld because it is supported by substantial evidence. (Docket No. 16).

### A.     Opinion of Dr. Dhar

At the outset, Plaintiff asserts that the ALJ's opinion is "fatally flawed and is not based on substantial evidence" because the ALJ improperly rejected the opinions of Dr. Dhar, a treating physician. (Docket No. 12 at 5–6). The medical opinions of treating physicians are generally entitled to substantial and possibly controlling weight. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201–02 (3d Cir. 2008); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); S.S.R. 96–5P, 1996 WL 374183, at *4. However, in order to be given greater weight, the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence. *Brown v. Astrue*, 649 F.3d 193, 196 (3d Cir. 2011). In weighing relevant medical evidence, the ALJ may choose which opinions to accord greater weight, but may not reject or ignore evidence in the record without providing a rationale. *Id.* (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000)). The opinion of a treating physician may generally be rejected outright only on the ground of contradictory medical evidence. *Id.*

16

Plaintiff points to Dr. Dhar's opinion as contained the March 25, 2008 Department of Public Works form, wherein she marked that Plaintiff is "permanently disabled." (Docket No. 12 at 6; R. at 174). With respect to this form, the ALJ did not err in rejecting Dr. Dhar's opinion that Plaintiff is disabled, as this determination is reserved for the Commissioner. 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.").

Plaintiff further argues that the ALJ erroneously rejected Dr. Dhar's opinions as contained in her July 17, 2012 medical source statement. (Docket No. 12 at 6). The ALJ observed that Dr. Dhar made two notations in response to several questions on a check-the-box form, wherein she indicated both that Plaintiff had no impairments and was extremely impaired. (R. at 16, 233). Although Plaintiff asserts that Dr. Dhar intended to note extreme impairment, this conclusion is not clear from the evidence. (R. at 233). However, even accepting Plaintiff's statement with respect to the internal consistency of this report, the ALJ's decision to reject Dr. Dhar's opinion would nevertheless be permitted because her opinions are unsupported by the record evidence. *Brown*, 649 F.3d at 196. Dr. Dhar's medical source statement consists almost entirely of responses to check-the-box prompts. (R. at 232–33). "The Court of Appeals for the Third Circuit has stated: 'Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.'" *Taliaferro v. Astrue*, 788 F. Supp. 2d 412, 419 (W.D. Pa. 2011) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). Dr. Dhar opined that Plaintiff is disabled because he suffers from "amnesia," memory loss, personality changes, difficulties remembering and carrying out instructions, poor concentration, and difficulties working with others—symptoms for which the record contains no substantiating

medical evidence. (R. at 232). The sole medical note contained in the record chronicling Dr. Dhar's treatment of Plaintiff similarly makes no reference to such issues. (R. at 183–84).

Additionally, in formulating Plaintiff's RFC, the ALJ relied heavily on the medical records of Dr. Smolar, who specializes in neurology and has treated Plaintiff since 2005. (R. at 186–87). Dr. Dhar's medical source statement is inconsistent with Dr. Smolar's notes, which indicate that he consistently found that Plaintiff's mental status was good, without memory problems. (R. at 232, 236–39). Dr. Smolar's records further reflect that Plaintiff's strength on his left side was improving through physical therapy. (R. at 186.). Given the inconsistencies between Dr. Dhar's opinion and Dr. Smolar's records, it was simply not error for the ALJ to credit the treatment notes of the specialist over the unsupported assertions of a primary care physician about the severity of Plaintiff's condition. *See* § 416.927(c)(5) (the ALJ will "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."); *see also Hauserman v. Colvin*, Civ. No. 13–50, 2013 WL 2557577, *6 (W.D. Pa. June 10, 2013) (citing § 404.1527(c)(5) and § 416.927(c)(5) in affirming the ALJ's grant of less weight to a non-specialist's opinion, which was inconsistent with notes by a specialist).

Plaintiff also argues that the ALJ should not have relied on Dr. Smolar's findings that Plaintiff is neurologically stable. (Docket No. 12 at 9–10). Plaintiff points to *Morales v. Apfel*, 225 F.3d 310 (2000) for this argument. 225 F.3d at 319 ("Nor was it proper for the ALJ to reject [one physician's] opinion based on [another physician's] notation that [plaintiff] was stable with medication."). *Morales*, however, is distinguishable because that case involved a claimant with serious mental health issues, for whom anxiety interfered with his ability to function. *Id.* (describing the plaintiff as a person "who suffers from an affective or personality disorder

marked by anxiety," such that "the work environment is completely different from home or a mental health clinic"). By contrast, Plaintiff has presented no evidence which would indicate that his functional capacity would change simply by entering a job setting. For these reasons, the ALJ did not err in giving no weight to the opinions of Dr. Dhar and placing great weight on Dr. Smolar's opinions contained in the medical records.

## B.    Listing 11.04

Plaintiff next argues that the ALJ erred by finding that Plaintiff does not meet the listing 11.04(B). (Docket No. 12 at 10). At Step 3, the ALJ must determine whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1. The burden is on the claimant to come forward with medical findings that show that the criteria of a listing are met. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112 120 n.2 (3d Cir. 2000). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Boggs v. Colvin*, Civ. No. 13-1229, 2014 WL 1670892, *19 (W.D. Pa. Apr. 28, 2014) (quoting *Sullivan v. Zebley,* 493 U.S. 521, 530 967 (1990) (emphasis in original)).

The language of Listing 11.04 provides:

> 11.04 *Central nervous system vascular accident.* With one of the following more than 3 months post-vascular accident:
> A. Sensory or motor aphasia resulting in ineffective speech or communication; or
> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.04. The language of Listing 11.00(C), which is referenced in Listing 11.04(B), provides:

> C. *Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.00(C).

In this Court's opinion, the ALJ's conclusion that Plaintiff's impairments do not equal Listing 11.04(B) is supported by substantial evidence. The ALJ recognized Plaintiff's ongoing deficits on his left side, but determined that the severity of these impairments did not equal the listing. (R. at 13–16). Although Plaintiff argues that remand is required simply due to the presence of deficits on his left side, (Docket No. 12 at 10–11), Listing 11.00(C) directs the Court to consider the *degree of interference* caused by such deficits. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.04(C). Plaintiff offered no medical opinion evidence to support his contention that his left-side impairments are "significant and persistent" and result in gross disturbances. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 11.04(B).

In finding that the Listing was not appropriate, the ALJ relied on the medical records of Dr. Smolar, which indicate that Plaintiff's strength continually improved with ongoing physical therapy. (R. at 187). As of March 2010, Dr. Smolar found that Plaintiff was "fairly strong on his left side," with "slightly diminished" coordination on the left, and overall good strength. (R. at 186). In April 2011, Dr. Smolar observed that Plaintiff had "only some minimal dysfunction on the left side with weakness, sensory change, and incoordination." (R. at 191). By May 2012, Plaintiff continued to have some ongoing numbness and weakness on his left side, as well as reduced sensation and coordination on the left, but Dr. Smolar noted that Plaintiff's gait was

steady and was neurologically stable. (R. at 236–37). On the whole, then, Dr. Smolar's notes do not support Plaintiff's arguments regarding the severity of his left-side deficits. At most, Plaintiff presented evidence of an impairment that manifests *some* of the criteria to meet this listing. *See Boggs v. Colvin*, Civ. No. 13-1229, 2014 WL 1670892, *19 (W.D. Pa. Apr. 28, 2014) (Fischer, J.). As a result, the ALJ's conclusion that Plaintiff does not meet the criteria for Listing 11.04(B) is supported by substantial evidence.


VI.     **CONCLUSION**

Based on the foregoing, Plaintiff's Motion for Summary Judgment [11] is DENIED, and Defendant's Motion for Summary Judgment [15] is GRANTED. Appropriate Orders follow.


                                        */s/ Nora Barry Fischer*
                                        Nora Barry Fischer
                                        United States District Judge

Dated: June 23, 2014
cc/ecf: All counsel of record.